

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00429-CV

———————————————

IN THE INTEREST OF A.S. AND S.S., CHILDREN

———————————————

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-587427-15

———————————————

Before Sudderth, C.J.; Gabriel and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Mother and Father appeal the trial court's termination of their rights to their two young children, A.S. and S.S.[1] Mother's counsel has filed an *Anders* brief. Because the brief meets the applicable requirements and our review of the record has discovered no appealable issues related to Mother, we affirm the trial court's termination of her rights.

In light of this decision, we will limit our discussion of the facts to those relevant to Father, who appeals the trial court's judgment primarily on grounds of evidentiary sufficiency. Because Father's continued drug use, failure to complete services, failure to maintain stable employment and housing, and other shortcomings are sufficient evidence to establish grounds for termination and that termination is in the children's best interest, we affirm the trial court's termination of his rights.

**Background**

**I. Initial interventions**

The children, A.S. and S.S., were first referred to the Department of Family and Protective Services in August 2017, when the Department received a report of possible sexual abuse of A.S., who had tested positive for herpes. The sexual-abuse allegation was ruled out by the Department, but due to reports of drug use by Mother and Father, the Department referred the family to caseworker Darrell Davis with Family Based

---

[1]The children were four and three years old, respectively, at the time of trial.

Safety Services (FBSS).[2]  Davis asked the parents to participate in drug testing and treatment programs, as well as counseling to address possible domestic violence and anger issues.  According to Davis, Father refused to work services and refused to go to drug testing as requested.

The situation worsened in May 2018 when the Department received allegations of neglectful supervision of S.S. and reports that both parents had been arrested.  Father had been arrested twice, the second time for assaulting the children's paternal grandfather—an offense for which he was later placed on deferred adjudication.[3]  Shortly after these incidents, the children were placed in the care of Father's cousin, where, in July 2018, S.S. suffered a fractured skull.  According to Davis, FBSS heard "two or three different stories" to explain the injury, but FBSS eventually concluded that S.S. fell off of a bed when left unattended.

Shortly after S.S.'s injury, the Department filed for the removal of the children to a foster home and the termination of Mother's and Father's rights.  The

---

[2]Davis explained that FBSS is an intermediate step between investigation and removal by Child Protective Services (CPS) and that FBSS receives cases if there are postinvestigation concerns that a parent may need counseling or treatment.

[3]Father pleaded guilty to the elderly-assault charge and was placed on deferred-adjudication community supervision; he remained subject to community supervision at the time of trial.  Notably, Father asserted his Fifth Amendment right against self-incrimination when asked if he had violated any community-supervision terms. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976) (holding the Fifth Amendment does not forbid adverse inferences against parties to civil actions).

Department's removal request was granted, and the children remained in foster care for the remainder of the proceedings.

## II. Termination proceedings

The Department continued to try to work with both parents. Both were placed on service plans that included psychological evaluations, counseling services, anger-management classes, parenting classes, and drug and alcohol assessments. Their service plans also required the parents to maintain stable housing and employment. Despite the fact that both were allowed extra time to complete their service plans, neither parent achieved success in completing the assigned tasks and meeting the requirements.

At trial, Father took little responsibility for his failure to complete the services. Instead, he blamed Mother, accusing her of stealing his car and leaving him without transportation. Although he completed some requirements of the service plan—attending one parenting class and all but two of the anger-management classes, submitting to a psychological evaluation, and participating in weekly visitation sessions when not incarcerated—he did not complete all of the assigned tasks. He failed to finish his counseling and failed to follow up on recommendations resulting from the drug and alcohol assessment. Father offered various excuses for his failures. He depicted himself as a victim of his circumstances; he blamed it on lack of transportation; he pointed to a series of family tragedies; and he faulted his CPS caseworker, Amy Rodgers, for not doing more to help him—even though he admitted that she personally

4

drove him to some appointments, made bus passes available to him, and attempted to accommodate him in other ways.

In addition to his failure to complete his services, the evidence at trial also showed that Father continued his drug use after the children were removed, that he bounced between jail and various unstable housing arrangements, and that he failed to maintain a steady job and stable housing. By contrast, the evidence showed that despite A.S.'s special health needs, both children were thriving in their foster home.

### A. Drugs

Father tested positive for methamphetamines and amphetamines in August and October 2018 and again in April 2019. At least five other tests were presumed positive because Father failed to comply with the Department's requests for random drug tests in May, June, September, and October 2019. At trial, Father admitted using drugs as recently as May 2019, and he blamed his failure to take drug tests on his lack of transportation and lack of "sufficient notice" from the Department.

### B. Jail and housing

Rodgers testified that she could not verify any housing for Father throughout the case. Father testified that he lived with friends upon his August 2018 release from jail, but he was homeless by November 2018. In December 2018, he went back to jail and remained there until January 2019. Upon his release, he hopped from house to house, staying with one set of friends and then another throughout the spring. In May 2019, he was yet again back in jail—Father testified he was arrested "on warrants" but

did not remember what the warrants were for. He remained in jail until September 2019.

After his September release from jail and up until the second day of trial on November 1, 2019, Father still had not secured a stable place to live and had no practical plan to find one, only an amorphous plan to live in an unspecified hotel. At trial, Father testified that he believed he could stay with family if awarded custody of the children, but he failed to give any information about the circumstances of any such arrangement.

### C. Employment

Rodgers estimated that Father had "around eight" jobs during the pendency of the case. Father blamed his struggle to maintain employment on his lack of transportation and on having to complete services in this case. At trial, he claimed to have been recently hired for a well-paying ($65,000 per year plus commissions) position. Given the day-of-trial notice, Rodgers could not verify the new employment.

### D. Father's lack of a plan for the children

In addition to refusing to take responsibility for his actions and failures, Father lacked any clear plan for the children. Instead, Father articulated his plan in broad, general terms—he testified that he "would make sure they were taken care of . . . no matter what [he] had to do." When asked what he would do to ensure that he had a safe place for the children, Father replied, "I mean, I don't know. I don't know. I just know that every - - I just know that when they're with me, they're my main concern.

6

So, I mean, that's it. I would do whatever it took to make sure they were taken care of. I always have."

### E. The children's health issues and their status in foster care

According to Rodgers, medical records evidenced the children's exposure to drugs, although she did not provide specifics. Both children suffered from behavioral issues, but A.S. in particular required extensive treatment and therapy for physical conditions.

In addition to having teeth so rotted that A.S. required surgery upon placement in foster care, A.S. suffers from a muscular condition called arthrogryposis. Rodgers explained that arthrogryposis, a lifelong condition, is "a weakness in [A.S.'s] muscles," that was concentrated primarily in the arms but also affected A.S.'s whole body. The children's Foster Mother testified that it prevented A.S. from maintaining balance, putting on clothes, brushing teeth, and going to the restroom without assistance. Foster Mother testified, "[W]e work with [A.S.] every day, everything [A.S.] does, pretty much. Helping [A.S.] dress [] and helping [A.S.] do things [A.S.] thinks [A.S.] can't do that are too hard because [A.S.] has the learned disabilities of not being able to do them." She described the treatment A.S. was receiving at the time of trial, which included hour-long, at-home physical therapy sessions one or two times a week and hour-long, weekly occupational therapy sessions. According to Foster Mother's testimony, A.S.'s condition was improving as a result of their hard work: A.S. was initially placed in a

7

special needs preschool but had since been moved to a traditional preschool, and A.S. could now dress without assistance most of the time.

Behaviorally, both children displayed "[a] lot of defiance" when initially taken in by the foster parents. Foster Mother testified that A.S.'s behavior had improved, describing A.S. as "happier now than [] before," "comfortable," and "not as defiant as [A.S.] was." Foster Mother attributed this to the structure their home provided. S.S. struggled more than A.S. with behavioral issues, but Foster Mother testified that S.S. was doing "okay" and improving in counseling, play therapy, and behavioral therapy sessions.

In general, Rodgers testified that both children were "doing very well" and "thriving" with their foster placement. She attested to the foster parents' taking the children to physical, occupational, play, behavioral, and individual therapy for A.S., and play and behavioral therapy for S.S., and to their facilitating of therapy sessions in their home. This was key to Rodgers' recommendation to terminate the parental rights: Rodgers testified that the children needed "ongoing consistency in their lives as far as stability, being in a home that's able to provide for [A.S.]'s needs," she expressed that A.S.'s physical condition will be lifelong and require consistent assistance, and she stressed that the children needed caregivers living a "sober lifestyle to provide them with a loving home and permanency until they become an adult and further."

8

### III. The trial court's decision

The trial court terminated both parents' parental rights. It found by clear and convincing evidence that termination was in the children's best interest and that Father had knowingly placed or allowed the children to remain in conditions endangering their physical or emotional well-being, or engaged in conduct or placed the children with another who engaged in conduct which did so; had refused to submit to a reasonable and lawful order of a court related to a child-abuse or neglect investigation; had failed to comply with the terms of his service plan; and had used a controlled substance in a manner that endangered the children and (1) failed to complete a court-ordered treatment program or (2) after completing a treatment program, continued to abuse a controlled substance. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (I), (O), (P).

## Discussion

### I. Mother's counsel's Anders brief

Mother's court-appointed appellate counsel filed a motion to withdraw as counsel and a brief in support of that motion. *See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967); *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016). Counsel's brief and motion meet the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no arguable grounds for relief. *See* 386 U.S. at 741–42, 87 S. Ct. at 1399. Mother has not filed a response.

As the reviewing appellate court, we must independently examine the record to decide whether counsel is correct in determining that an appeal in this case is frivolous.

9

*See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* brief, we agree with counsel that the appeal is frivolous. *See K.R.C.*, 346 S.W.3d at 619. We find nothing in the record that might arguably support Mother's appeal. Accordingly, we affirm the trial court's judgment.

We deny Mother's counsel's motion to withdraw in light of *In re P.M.* because the brief does not show "good cause" other than counsel's determination that an appeal would be frivolous. 520 S.W.3d at 27 ("[A]n *Anders* motion to withdraw brought in the court of appeals, in the absence of additional grounds for withdrawal, may be premature."); *In re A.M.*, 495 S.W.3d 573, 582–83 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (noting that since *In re P.M.* was handed down, "most courts of appeals affirming parental termination orders after receiving *Anders* briefs have denied the attorney's motion to withdraw"). The supreme court has held that in cases such as this, "appointed counsel's obligations [in the supreme court] can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *P.M.*, 520 S.W.3d at 27–28.

## II. Father's appeal

Father brings seven issues on appeal. In his first five issues, he challenges each of the grounds upon which the trial court granted termination; in his sixth, he challenges the trial court's best-interest finding. In his seventh and final issue, he challenges the

trial court's denial of his motion for continuance of the trial. We overrule all seven of his issues and affirm the trial court's judgment.

## A. Sufficiency of the evidence

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

### 1. Standards of review

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable

factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the grounds for termination or that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

In either review, the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

### 2. Grounds for termination

The trial court found sufficient evidence to support six grounds for terminating Father's parental rights, including the endangerment grounds provided in Subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We are required by due process to address challenges to Subsection (D) or (E) findings, so we will address those first. *See In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019).

Subsections (D) and (E) provide for termination of parental rights when a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," respectively. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Because of the interrelated nature of evidence of endangerment for both grounds, we will consolidate our examination. *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

"Endanger" means to expose to loss or injury, to jeopardize. *Id.* at 125 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Subsection (D) requires an examination of evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *Id.* We have recognized that parental drug abuse and drug-related criminal activity, as well as violent conduct by a parent, may support a conclusion that the children's surroundings endanger their physical or emotional well-being. *Id.*

Subsection (E) requires an examination of whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *Id.* (citing *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ)). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary,

13

deliberate, and conscious course of conduct by the parent is required. *Id.* But this is not to be construed as a requirement that the parent's conduct be directed at the children or that the children actually suffer injury. *Id.* (citing *Boyd*, 727 S.W.2d at 533).

The record evidences a cycle of drug abuse and other behavior by Father that endangered the children. The trial court could have reasonably inferred that Father began abusing drugs before the children were removed to foster care based upon Rodgers' representation that the children had been exposed to drugs and Davis's testimony concerning reports of drug abuse and Father's refusal to take drug tests in the FBSS stage. Father admitted to abusing methamphetamine for at least ten months after the children were removed. His drug use certainly created a dangerous environment and presented a direct danger to the children's well-being. *See In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *J.T.G.*, 121 S.W.3d at 125.

Evidence of Father's violent conduct, including his assault of his own grandfather shortly before the children were removed, and his criminal history, which put him in jail at least three times during the proceedings, was also presented. Evidence of abusive or violent behavior and of imprisonment weigh in favor of an endangerment finding. *See S.R.*, 452 S.W.3d at 360–61.

Finally, we take into account Father's failure to complete his service plan in determining whether his conduct risks endangering the children. *In re M.R.*, 243 S.W.3d 807, 818 (Tex. App.—Fort Worth 2007, no pet.). Father failed to fully take

14

responsibility for his failure to complete the service plan, instead blaming his circumstances and Rodgers, despite her efforts to help him.

Considering the evidence in the light most favorable to the trial court's findings and considering the record as a whole, the evidence is sufficient to support the Subsection (D) and (E) endangerment findings. We therefore overrule Father's first and second issues. Because we hold that the evidence is sufficient to uphold either finding, and because only one finding is necessary to sustain a parental-rights termination, we need not address Father's challenges to the trial court's other findings of grounds for termination. *See* Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *J.L.*, 163 S.W.3d at 84; *see also* Tex. R. App. P. 47.1. We therefore overrule Father's third, fourth, and fifth issues.

### 3. Best-interest finding

Although we generally presume that keeping children with a parent is in the children's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the children's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of the children's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b). We also

15

consider the evidence in light of nonexclusive factors that the factfinder may apply in

determining the children's best interest:

(A)    the [children's] desires . . . ;

(B)    the [children's] emotional and physical needs[,] . . . now and in the future;

(C)    the emotional and physical danger to the child[ren] now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the [children's] best interest . . . ;

(F)    the plans for the child[ren] by these individuals or[, if applicable,] by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402

S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among

other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive, and some listed factors may not apply to some cases.

*C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be

sufficient to support a finding that termination is in the children's best interest. *Id.* On

the other hand, the presence of scant evidence relevant to each factor will not support

such a finding. *Id.*

16

The trial court heard evidence of A.S.'s serious physical needs due to arthrogryposis, a lifetime condition which will require extensive physical and occupational therapy. It also heard evidence of S.S.'s behavioral issues. Also concerning is the testimony that the children were exposed to drugs while in their parents' custody. Father's drug abuse not only endangered the children, as we have discussed above, but also put in doubt his abilities to properly care for the children's physical and emotional health. Evidence of such drug use supports a best-interest finding to minimize future risk to the children's physical and emotional well-being. *See In re M.C.*, 482 S.W.3d 675, 690 (Tex. App.—Texarkana 2016, pet. denied). The children's needs require consistency and structure, and Father's history of homelessness, unstable employment, and drug use tend to prove that he cannot provide that. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."); *In re K.A.S.*, 131 S.W.3d 215, 229 (Tex. App.—Fort Worth 2004, pet. denied) ("A trial court can measure the future conduct of parents by their recent past conduct.").

Father made an effort to complete some of the assigned services, and he made a commendable effort to attend visitation sessions with the children. But overall, Father made a poor showing of his parental abilities at trial. He largely sought to place blame on other people—Mother, Rodgers—for his failure to stop abusing drugs, to stay out of jail, to maintain stable housing and stable employment, and to complete the required

17

services. His promises to do right by his children were overshadowed by his vague plans for the children if awarded custody—he offered a nebulous plan to get stable housing sometime soon and to look into short-term childcare arrangements offered by the Department. He was living in a hotel at the time of trial. All of these facts weigh heavily in favor of termination in the best interest of the children. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.) (considering failure to comply with service plan); *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (considering evidence that mother had failed to avail herself of available programs).

Evidence presented of the children's placement in an adoption-motivated foster home further supports the trial court's best-interest determination. *See C.H.*, 89 S.W.3d at 28. Rodgers and Foster Mom both testified to the improvements seen in both A.S. and S.S. since their placement. A.S. especially benefitted from the placement because A.S. was able to access necessary physical therapy on a consistent basis. *See In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *10 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (weighing in favor of termination foster family's meeting children's special needs and plans to adopt children). Both children appeared to have benefitted already from the structure offered by their foster parents. According to Roberts, the children were "thriving."

Viewing the record as a whole, the evidence is sufficient to support the trial court's best-interest finding. We therefore overrule Father's sixth issue.

## III. Continuance

In his final issue, Father argues that the trial court erred by denying his motion for a continuance of the November 1, 2019, termination hearing to allow him additional time to complete services and establish stable housing. Granting or denying a motion for continuance is a decision left to the trial court's broad discretion, and we will only reverse such a decision if the record discloses a clear abuse of discretion. *In re R.F. III*, 423 S.W.3d 486, 490 (Tex. App.—San Antonio 2014, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. *Id.* We may not substitute our judgment simply because we may have ruled differently. *Id.*

Father's argument neglects to mention that he was previously granted a continuance to allow extra time for him to complete services. Father moved to continue the July 29 final-hearing setting, and that motion was partially granted[4] and the hearing was rescheduled to November 1.

Contrary to his assertions, Father's last-minute acquisition of employment did not mandate a continuance in this situation—especially considering that he had already been given "extra time" to complete the plan, his lack of actual plans for custody of his children, and his ten-month delay in getting clean. *See In re O.R.F.*, 417 S.W.3d 24, 42

---

[4]The trial court took the testimony of one witness—Davis—on that day because it was his last day of employment with FBSS before moving out of state.

(Tex. App.—Texarkana 2013, pet. denied) (holding last-minute sobriety did not require continuance); *In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *8 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.) (holding similarly regarding mother's ten-month delay in addressing her drug addiction).

We disagree with Father's contention that the trial court abused its discretion and overrule his seventh issue.

## Conclusion

Having determined that Mother's appeal is frivolous and having overruled all of Father's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: April 30, 2020